[No. C053407. Third Dist. Aug. 24, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
EDWARD D. JONES & CO., Defendant and Respondent.

## COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Thomas Greene, Chief Assistant Attorney General, Mark J. Breckler, Assistant Attorney General, Jon M. Ichinaga and W. Richard Sintek, Deputy Attorneys General, for Plaintiff and Appellant.

Saint Martin & Fan and Amy Fan for North American Securities Administrators Association, Inc., Rex Staples, Stephen Hall, Joseph Brady and Lesley Walker as Amici Curiae on behalf of Plaintiff and Appellant.

Keesal, Young & Logan, Scott T. Pratt, Bentley P. Stansbury III; Greensfelder, Hemker & Gale, David M. Harris and David M. Neimeier for Defendant and Respondent.

## OPINION

**ROBIE, J.**—The People of the State of California sued Edward D. Jones & Co. (Edward Jones), a brokerage firm, for failing to adequately disclose to

investors and potential investors certain "shelf-space" agreements under which Edward Jones received additional compensation for selling certain preferred mutual funds. The trial court dismissed the action on the ground it was preempted by federal law—namely, the National Securities Markets Improvement Act of 1996 (Pub.L. No. 104-290 (Oct. 11, 1996) 110 Stat. 3416, 3417; 15 U.S.C. § 77r) (NSMIA)—because, in the court's view, "[t]he assertion of California's authority in this manner conflicts with the federal regulation of information provided in mutual fund prospectuses."

We conclude this action is not preempted by the NSMIA because it is a type of action expressly permitted by that statute. We also conclude the action is not preempted by the United States Securities and Exchange Commission (SEC) rule 10b-10 (17 C.F.R. § 240.10b-10 (2005)) (rule 10b-10) because the action does not conflict with that rule. Accordingly, we will reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from the second amended complaint, which is the operative pleading for our purposes.

Edward Jones is a national brokerage firm that maintains at least 450 branch offices in California and is a "broker-dealer" within the meaning of Corporations Code section 25004.[1] Since at least January 1, 2000, Edward Jones has offered for sale and sold shares of mutual funds from seven mutual fund complexes referred to in this action as the "preferred funds."[2] During this time, Edward Jones has had "shelf-space" agreements with the preferred funds.

Generally, a shelf-space agreement "occurs when a mutual fund pays [additional compensation] in exchange for the broker-dealer preferentially marketing its shares." Shelf-space agreements "may increase costs to investors as well as create conflicts of interest between investors and the financial professionals with whom they deal."

Since January 1, 2000, Edward Jones has received approximately $300 million in additional compensation under its shelf-space agreements with the

---

[1] " 'Broker-dealer' means any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account." (Corp. Code, § 25004, subd. (a).)

All further statutory references are to the Corporations Code unless otherwise indicated.

[2] A mutual fund complex is apparently a company that offers a number of different mutual funds. The seven mutual fund complexes referred to in this action as the preferred funds are American Funds, Federated Investors, Goldman Sachs, Hartford, Lord Abbett, Putnam Funds, and Van Kampen Investments.

preferred funds in exchange for "heightened visibility of the Preferred Funds within [Edward] Jones'[s] distribution and/or sales systems" and "privileged access to [Edward] Jones'[s] distribution and/or sales systems." Edward Jones, however, has not disclosed to investors or potential investors sufficient facts to alert them to the existence of the shelf-space agreements, the consideration paid under the agreements, Edward Jones's obligations under the agreements, or the potential and/or actual conflicts of interest between Edward Jones and its customers created by those agreements (collectively the undisclosed matters). The mutual fund prospectuses and statements of additional information (collectively the disclosure documents) prepared by the preferred funds disclose only that "from time to time additional cash bonuses or other incentives [are] made to selected participating brokers in connection with the sale or servicing of mutual fund shares and on occasions such bonuses or incentives may be conditioned upon the sale of a specified minimum amount of those shares."

In December 2004, the People commenced this action against Edward Jones based on the shelf-space agreements. Specifically, the People alleged that in offering for sale and/or selling shares of the preferred funds' mutual funds without disclosing the undisclosed matters, Edward Jones violated section 25401[3] and section 25216, subdivision (a)[4] because the undisclosed matters are material facts that are necessary to make the statements in the disclosure documents not misleading. The People sought injunctive relief, civil penalties, disgorgement, and other relief.

After an unsuccessful attempt to move the case to federal court, Edward Jones demurred (as relevant here) on the ground that the action was preempted by federal securities law, specifically, rule 10b-10. Edward Jones asserted that under that rule it was not obliged "to provide the 'details and significance' of its revenue sharing agreements [i.e., shelf-space agreements] with certain mutual fund companies." Edward Jones further argued that allowing the People "to proceed in this case would be a usurpation of the SEC's regulatory authority."

The trial court (Judge Brian Van Camp) overruled the demurrer, concluding "based on the long history of concurrent state and federal securities law, that while SEC Rule 10b-10 (17 C.F.R. section 240.10b-10[]) may overlap with

---

[3] Section 25401 makes it "unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

[4] Subdivision (a) of section 25216 provides that "[n]o broker-dealer or agent shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state by means of any manipulative, deceptive or other fraudulent scheme, device, or contrivance."

state enforcement actions, that Rule is not determinative of whether Corp. Code sections 25401 and 25216(a) have been violated. [¶] . . . [T]here is no policy objective sought to be advanced by the SEC which would be frustrated by this enforcement action, therefore Corp. Code sections 25401 and 25216(a) are not preempted by federal securities law."

Because Edward Jones had "entered into a series of agreements and consent orders requiring Jones to modify its policies and procedures regarding the disclosure of revenue sharing agreements and payments," the trial court granted Edward Jones's motion to strike the request for injunctive relief but gave the People leave to amend. The People filed their first amended complaint in August 2005, but the trial court ultimately struck the request for injunctive relief from that complaint without leave to amend, leaving the People to seek monetary relief only.

Thereafter, in December 2005, Edward Jones filed a motion for judgment on the pleadings. Once again Edward Jones contended the People's action was preempted by rule 10b-10—the same argument Edward Jones had unsuccessfully asserted in support of its demurrer to the original complaint. In addition, however, Edward Jones asserted the action was preempted by the NSMIA. On this point, Edward Jones pointed to a recent decision by the Los Angeles County Superior Court dismissing an identical action by the People against one of the preferred funds on that basis.

In opposing the motion, the People asserted both that the action was not preempted and that Edward Jones's motion was an improper motion for reconsideration of the order overruling the demurrer.

In its tentative ruling, the trial court (Judge Loren McMaster) rejected the People's procedural challenge to the motion, but agreed the action was not preempted under either the NSMIA or rule 10b-10. After argument, however, the court changed its mind on the issue of preemption by the NSMIA. The court explained that it was persuaded "that the contents of a prospectus [are] subject to federal conflict preemption." The court gave the People leave to amend, however, regarding additional disclosures Edward Jones could have provided.

In April 2006, the People filed their second amended complaint (the operative pleading here). Edward Jones demurred again, and this time the court sustained the demurrer without leave to amend. Relying on the NSMIA, the court concluded that the People's "action here seeks to impose the State of California's view of what a prospect[us] should say on mutual funds that have a 'shelf agreement' with broker-dealer[s]. The assertion of California's authority in this manner conflicts with the federal regulation of information

provided in mutual fund prospectuses and hence is pre-empted by such. This is clearly an area that requires nationwide uniformity and consistency and not be subject to the differing rules of 50 states."

The court entered judgment in favor of Edward Jones in June 2006, and after the court denied the People's motion to vacate the judgment or for a new trial, the People filed a timely notice of appeal.

## DISCUSSION

## I

### Judgment on the Pleadings Following an Unsuccessful Demurrer

The People first contend we should reverse the judgment because it was premised on Judge McMaster's order granting judgment on the pleadings (with leave to amend). According to the People, in granting judgment on the pleadings, "Judge McMaster, in effect, reversed Judge Van Camp's order overruling Jones'[s] demurrer." The People contend Judge McMaster's action was improper because of the "general rule [that] one trial judge cannot reconsider and overrule an order of another trial judge." (*People v. Riva* (2003) 112 Cal.App.4th 981, 991 [5 Cal.Rptr.3d 649].) They also contend it was improper because Edward Jones's motion was not based on new or different facts, circumstances, or law. In support of this latter contention, the People rely on both Code of Civil Procedure section 438, subdivision (g)(1), which governs motions for judgment on the pleadings,[5] and Code of Civil Procedure section 1008, subdivision (b), which governs motions for reconsideration generally.[6]

For its part, Edward Jones argues that (1) Code of Civil Procedure section 438 does not apply because Edward Jones's motion was a *common law* motion for judgment on the pleadings rather than a *statutory* motion for judgment on the pleadings; (2) Code of Civil Procedure section 1008 and the

---

[5] Under subdivision (g)(1) of section 438 of the Code of Civil Procedure, a motion for judgment on the pleadings "may be made even though" "[t]he moving party has already demurred to the complaint or answer, as the case may be, on the same grounds as is the basis for the motion provided for in this section and the demurrer has been overruled, provided that there has been a material change in applicable case law or statute since the ruling on the demurrer."

[6] Under subdivision (b) of section 1008 of the Code of Civil Procedure, "A party who originally made an application for an order which was refused in whole or part, . . . may make a subsequent application for the same order upon new or different facts, circumstances, or law . . . ."

general rule against one judge overruling another judge do not apply because Edward Jones did not move for reconsideration of the order overruling the demurrer, but instead moved for judgment on the pleadings, which is a different order altogether; and (3) in any event, Edward Jones's motion was based on new law, specifically, an intervening superior court decision finding preemption under the NSMIA.

The foregoing arguments raise a number of interesting issues. We need not reach any of them, however, because even if we assume for the sake of argument that it *was* error for Judge McMaster to rule on Edward Jones's motion for judgment on the pleadings and thereby effectively overrule Judge Van Camp's order on the demurrer, that error cannot be deemed reversible without reaching the merits of the preemption issue. In other words, even if the People are right in their assertion of procedural error, we cannot reverse the judgment unless the People are also correct on the substantive issue of preemption. Accordingly, we may resolve the case based on the substantive issue alone, and that is what we will do.

The conclusion that we must reach the substantive issue even if we find procedural error flows from the constitutional doctrine of reversible error. Section 13 of article VI of the California Constitution commands that "[n]o judgment shall be set aside . . . in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause . . . the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." What that means here is that we cannot reverse the judgment of dismissal based on Judge McMaster's alleged error in ruling on the motion for judgment on the pleadings unless we are convinced that that ruling resulted in a miscarriage of justice to the People. But if Judge McMaster was ultimately *right* on the substantive issue he decided—that this action is preempted by federal securities law—then no miscarriage of justice occurred (even if Judge McMaster never should have ruled on the motion for judgment on the pleadings in the first place) because preventing the People from proceeding on an action that is preempted by federal law cannot be deemed a miscarriage of justice.

Of course, if Judge McMaster's ruling on the substantive issue was *wrong*, and this action is *not* preempted, then the People can show a miscarriage of justice. But that miscarriage of justice would exist not simply because Judge McMaster reconsidered Judge Van Camp's ruling on the preemption issue when he should not have, but because he came to the wrong conclusion on that issue when he did so. In other words, a miscarriage of justice—i.e., reversible error—can be found in this case only if Judge McMaster was wrong on the substantive issue of preemption, and therefore we can (and should) resolve the case on that issue alone.

Our conclusion is supported by *Payne v. City of Perris* (1993) 12 Cal.App.4th 1738 [16 Cal.Rptr.2d 143]. *Payne* involved a tort action arising out of a death from a police vehicle pursuit. The city demurred, contending it was immune from liability under a certain Vehicle Code provision because the city had adopted a written policy on vehicle pursuits. (*Id.* at p. 1741.) The demurrer was overruled on the ground the guidelines in the policy "were not sufficient and that a question existed as to whether the policy was actually adopted or implemented." (*Ibid.*) Later, however, the city moved for summary judgment, again contending the statutory immunity applied. (*Ibid.*) This time the trial court found the city was immune from liability and entered judgment accordingly. (*Ibid.*)

On appeal, the appellate court first considered whether it was error for the second judge, on the motion for summary judgment, to reanalyze whether the city was immune and to render a different ruling on that issue than the one previously made by a different judge in connection with the city's demurrer. (*Payne v. City of Perris, supra,* 12 Cal.App.4th at pp. 1741–1743.) The appellate court concluded that "any error committed by [the second judge] in essentially overruling [the first judge's] determination on [the immunity] issue d[id] not warrant reversal." (*Id.* at p. 1742.) The court explained that because the issue involved was "a pure question of law—not dependent upon any factual determinations and one not left to the trial court's discretion, little purpose would be served in reversing the judgment. This court is not bound by either [the first judge's] or [the second judge's] determination on the question of law presented and there is, therefore, no reason for this court not to proceed to the issue on its merits at this time. To conclude otherwise would require the parties to litigate an action possibly based on an incorrect legal premise only for this court to later reverse any subsequent judgment because of that same incorrect legal premise. We refuse to elevate form over substance in that fashion and accordingly proceed to the [immunity] question . . . ." (*Id.* at p. 1743.)

Although the court in *Payne* did not speak in terms of reversible error, the court's reasoning fully supports our conclusion here. By refusing "to elevate form over substance," the *Payne* court was refusing to reverse a judgment based on a procedural error that would turn out to be harmless if the court ultimately determined the action was barred as a matter of law. Such is the case here.

The People contend *Payne* was "impliedly overruled" by the Supreme Court's decision in *Le Francois v. Goel* (2005) 35 Cal.4th 1094 [29 Cal.Rptr.3d 249, 112 P.3d 636], but we disagree. In *Le Francois*, our Supreme Court concluded that Code of Civil Procedure section 1008 constitutionally "prohibit[s] a *party* from [seeking reconsideration] not based on

new facts or law, but do[es] not limit a *court's* ability to reconsider its previous interim orders on its own motion, as long as it gives the parties notice that it may do so and a reasonable opportunity to litigate the question." (*Le Francois*, at pp. 1096–1097.) Justice Kennard filed a concurring and dissenting opinion in which she concluded the judgment should be affirmed, notwithstanding the trial court's error in granting an impermissible motion for reconsideration, because no miscarriage of justice had been shown. (*Id.* at pp. 1109–1110 (conc. & dis. opn. of Kennard, J.).) The majority disagreed that the judgment should be affirmed "on the basis of harmless error" because "defendants have made no such harmless error argument, and thus plaintiffs have had no chance to argue against it. Moreover, the trial court did not inform the parties that it might change its previous ruling on its own motion and give them an opportunity to be heard, as it should have done. We do not know what would have occurred if it had done so. Under the circumstances, we think it best to remand the matter for the court and parties to follow proper procedure." (*Id.* at p. 1109, fn. 6 (maj. opn. of Chin, J.).)

Contrary to the People's suggestion, *Le Francois* did not purport to establish that a procedural error in considering an improper motion for reconsideration is always reversible without regard to the substantive issue involved. The majority decided to reverse on the facts of that case both because the parties had not argued harmless error and because, essentially, the court could not tell if the error was harmless because it did "not know what would have occurred if" the trial court had followed the proper procedure.

Here, both parties have argued whether the reasoning in *Payne* applies here and thus have, at least tangentially, addressed the issue of harmless error. More importantly, since we confront here a pure question of law that was argued three times in the trial court, there is no basis for concern about what might have happened absent the alleged procedural error. The question before us now is the same question that will be presented on appeal if the case is tried and the People prevail—is the action preempted by federal law? If Edward Jones is correct in asserting that the action is preempted, then the People have suffered no harm from the procedural error they assert here.

Under the constitutional principle of reversible error set forth in section 13 of article VI of the California Constitution, we cannot reverse a judgment based on a procedural error unless there has been a miscarriage of justice, and here we cannot determine whether there has been a miscarriage of justice without addressing the substantive issue of preemption, since there would be no miscarriage of justice in precluding the People from proceeding with an action that is preempted by federal law. For these reasons, we decline to resolve this case on the procedural issues the People raise and instead turn to the substantive issue of whether the action is preempted by federal law.

## II

### *Preemption*

■ "The basic rules of preemption are not in dispute: Under the supremacy clause of the United States Constitution (art. VI, cl. 2), Congress has the power to preempt state law concerning matters that lie within the authority of Congress. [Citation.] In determining whether federal law preempts state law, a court's task is to discern congressional intent. [Citation.] Congress's express intent in this regard will be found when Congress explicitly states that it is preempting state authority. [Citation.] Congress's implied intent to preempt is found (i) when it is clear that Congress intended, by comprehensive legislation, to occupy the entire field of regulation, leaving no room for the states to supplement federal law [citation]; (ii) when compliance with both federal and state regulations is an impossibility [citation]; or (iii) when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955 [17 Cal.Rptr.3d 180, 95 P.3d 422].)

■ "The party who claims that a state statute is preempted by federal law bears the burden of demonstrating preemption." (*Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at p. 956.)

### A

### *Preemption by the NSMIA*

In arguing that the NSMIA preempts this action, Edward Jones relies on the third type of implied preemption described by our Supreme Court in *Bronco Wine Co.* Specifically, Edward Jones asserts that the People's action "would create . . . an obstacle to accomplishing the objectives of the statute." According to Edward Jones, "the central purpose of [the] NSMIA . . . is to eliminate the costs and burdens of duplicate and unnecessary state regulation by making the federal government the sole regulator of offering documents circulated nationwide." Edward Jones claims that by this action, the People are challenging the adequacy of the disclosures made in the offering documents prepared by the mutual fund companies. Edward Jones asserts that "[i]f California and the other states are able to dictate and control the content of prospectuses, then prospectus disclosure would be subject to potentially conflicting or inconsistent regulations in more than fifty different jurisdictions. This is the very vice that [the] NSMIA prohibits and is contrary to manifest congressional intent."

As we will explain, Edward Jones's argument fails because the People's action is a type of action expressly permitted by the NSMIA. That which is

expressly permitted cannot be implicitly prohibited. Accordingly, the People's action is not preempted by the NSMIA.

As relevant here, the NSMIA provides that "[e]xcept as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof—[¶] . . . [¶] . . . shall directly or indirectly prohibit, limit, or impose any conditions upon the use of—[¶] . . . with respect to a covered security . . . any offering document that is prepared by or on behalf of the issuer." (15 U.S.C. § 77r(a)(2)(A).) Edward Jones contends that "[t]his statutory language squarely conflicts with, and thus preempts, the [People's] claims [here], which by the [People's] own admission, seek to 'challenge the sufficiency of disclosures in mutual fund Offering Documents under California's securities anti-fraud and broker misconduct statutes.' " (Underscoring omitted.)

The flaw in Edward Jones's argument is that the prohibition on which it relies is subject to an express exception within which the People's action falls. True, the NSMIA expressly prohibits any state action that would even indirectly limit the use of a mutual fund prospectus, but that prohibition is not absolute, as Edward Jones's argument tends to suggest. Rather, the statute specifically qualifies the prohibition with the phrase, "[e]xcept as otherwise provided in this section." That requires us to look to the remainder of the statute to determine the true scope of the prohibition. When we do so, we find subsection (c), entitled "Preservation of authority," and, more specifically, subsection (c)(1), which deals with "Fraud authority." (See 15 U.S.C. § 77r(c)(1).) This provision—which the parties refer to as the "savings clause"—provides that "[c]onsistent with this section, the securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions." (15 U.S.C. § 77r(c)(1).)

What does this savings clause tell us about the scope of the NSMIA's prohibitions as applied here? It tells us that the NSMIA prohibits any state action that would limit the use of a mutual fund prospectus, *except for* "enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions." In other words, an enforcement action of the type described in subsection (c) of 15 United States Code section 77r is *expressly excepted* from the prohibitions found in subsection (a) of the statute. Thus, an enforcement action with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions *may* limit the use of a mutual fund prospectus, notwithstanding the prohibition against effecting such a limitation by other methods.

Edward Jones contends the savings clause is "inapposite" for two reasons. First, Edward Jones contends a savings clause does not necessarily preclude a finding of conflict preemption. (See *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 926 [12 Cal.Rptr.3d 262, 88 P.3d 1].) While that may be true, we conclude the particular savings clause at issue here *does* preclude such a finding. As we have explained, reading the statute as a whole, including the savings clause, the NSMIA prohibits state action that would limit the use of a mutual fund prospectus *except* if that state action is an enforcement action of the type described in the savings clause.

■ Second, Edward Jones contends that "[t]he alleged omissions complained of by the [People] are not indicative of common law fraud or deceit by a broker-dealer." But nothing in the NSMIA limits the savings clause to actions based on "common law fraud or deceit." Rather, the savings clause applies much more broadly to "enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions." The People's action unquestionably falls within the scope of this language because, at the very least, the People have alleged "unlawful conduct by a broker or dealer" by alleging that Edward Jones's conduct in selling and/or offering for sale certain mutual funds violated section 25401 and section 25216, subdivision (a).

■ In summary, we conclude that this action is the type of enforcement action the NSMIA expressly excepts from its prohibitions. Because we reach this conclusion based on the unambiguous language of the statute, we need not consider the statute's legislative history. As a matter of plain statutory meaning, this action does not conflict with the NSMIA and is therefore not preempted by that statute.[7]

B

*Rule 10b-10*

Edward Jones contends that independent of the NSMIA, this action is preempted by the disclosure requirements in rule 10b-10. Again, we disagree.[8]

■ A federal regulation may have the same preemptive effect as a federal statute when the promulgating agency acted within the scope of its congressionally delegated authority in promulgating the regulation. (*Jevne v. Superior*

---

[7] Our conclusion on this issue is consistent with the recent decision of Division One of the Court of Appeal, Second Appellate District in *Capital Research & Management Co. v. Brown* (2007) 147 Cal.App.4th 58 [53 Cal.Rptr.3d 770].

[8] We grant both parties' requests for judicial notice relating to this issue.

*Court* (2005) 35 Cal.4th 935, 950–951 [28 Cal.Rptr.3d 685, 111 P.3d 954].) The relevant question is whether the promulgating agency intended preemption. (*Id.* at p. 951.)

Rule 10b-10 prescribes certain information a broker must disclose to the customer when completing a securities transaction for the customer. (See 17 C.F.R. § 240.10b-10 (2005).)

In asserting that the rule preempts this action, Edward Jones spends almost all of its time arguing that a broker-dealer does not have an obligation under the rule to disclose third party remuneration beyond the disclosures contained in the prospectus supplied by the mutual fund. Even if we assume this to be true, however, Edward Jones's argument skirts the most pertinent question, which is this: By requiring the disclosure of certain information in rule 10b-10, did the SEC intend to foreclose states from bringing enforcement actions against broker-dealers for not disclosing *additional* information the states deem material?

That question is answered by the preliminary note to the rule, which Edward Jones ignores, leaving the People to bring it to our attention in their reply brief. That note explains that "[t]he requirements under this section that particular information be disclosed is not determinative of a broker-dealer's obligation under the general antifraud provisions of the federal securities laws to disclose additional information to a customer at the time of the customer's investment decision." (17 C.F.R. § 240.10b-10, preliminary note (2005).) This provision makes clear that compliance with rule 10b-10 does not preclude a broker-dealer from being charged with violating its obligation under the general antifraud provisions of federal securities law based on its failure to disclose additional information not required by the rule. The question, then, is why would the SEC have intended rule 10b-10 to preclude similar charges under *state* antifraud laws, such as those at issue here?

Edward Jones has no answer to that question, nor do we. If, as the preliminary note makes clear, rule 10b-10 is not determinative of what information a broker-dealer must disclose in connection with a particular securities transaction, then we see no conflict between the rule and this action. Here, the People seek to show that disclosure of further material information regarding the shelf-space agreements was necessary to prevent the information Edward Jones did disclose from being misleading. If the People prevail and obtain the monetary relief they seek, their success will not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the SEC in enacting rule 10b-10. Accordingly, this action is not preempted by that rule.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with instructions to vacate the order sustaining the demurrer without leave to amend and enter a new and different order overruling the demurrer. The People shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(2).)

Raye, Acting P. J., and Butz, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 28, 2007, S157107.