[No. C056138. Third Dist. Dec. 29, 2008.]

GROSSMONT UNION HIGH SCHOOL DISTRICT, Plaintiff and Appellant, v.
STATE DEPARTMENT OF EDUCATION, Defendant and Respondent.

874

COUNSEL

Stutz Artiano Shinoff & Holtz, Daniel R. Shinoff, Jack M. Sleeth, Jr., and Paul V. Carelli IV for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Julie Weng-Gutierrez and Pauline Gee, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**MORRISON, J.**—The County of San Diego (County) and other counties provided mental health services to special education students. When the Legislature slashed the funding for such services to $1,000 *statewide*, the County sought and obtained a superior court judgment holding that because this was an unfunded state mandate, the County did not have to provide such services. In response, the State Department of Education (Department) required local school districts to absorb the costs of these services.

Grossmont Union High School District (Grossmont) sued the Department, primarily seeking a declaration that it should not have to pay these costs. The Department demurred, asserting Grossmont failed to exhaust available administrative remedies, specifically, that it first had to submit the dispute to California's Commission on State Mandates (Commission). The trial court sustained the demurrer without leave to amend.

Grossmont asserts it would be futile to exhaust administrative remedies because the Commission's authority extends over only *state* programs or levels of service, but the costs Grossmont complains of result from *federal* mandates. Grossmont also asserts that its contractual and equal protection theories do not implicate the Commission's authority.

Although a party may be excused from complying with an administrative remedy when it would be futile to do so, that exception is narrow and applies only when the outcome of the administrative proceeding is certain. In this case, Grossmont's complaint alleges facts suggesting the mandate may be a "mixed" mandate for which partial reimbursement would be available: The Commission is the body entrusted to make such determination in the first instance.

Further, if, as Grossmont states, there were no possibility the Commission would rule in its favor, that would mean Grossmont pleaded itself out of court entirely, because the judiciary lacks any general warrant to compel appropriations or to declare a mandate unenforceable, except after the Commission has found an unfunded mandate.

We also reject Grossmont's subsidiary theories. We conclude Grossmont is not an intended beneficiary of the federal-state special education funding laws. We also conclude the requirement that Grossmont provide services to special education students does not deprive regular students of equal protection, although regular education programs will be cut.

Accordingly, we agree with the trial court that Grossmont's complaint fails to state a cause of action. Because Grossmont does not suggest how the

complaint might be amended, leave to amend was properly denied. (See *Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 890 [6 Cal.Rptr.2d 151].) We shall affirm.

## I.  BACKGROUND

We first describe: (A) unfunded state mandates and the Commission's authority; (B) special education; (C) the standard of review over demurrers; (D) Grossmont's complaint; and (E) the demurrer and ruling leading to Grossmont's appeal to this court.

### A.  Unfunded State Mandates

The Property Tax Relief Act of 1972, or "SB 90" (Senate Bill No. 90 (1972 Reg. Sess.)) (see Stats. 1972, ch. 1406, p. 2931; Stats. 1973, ch. 358, p. 778), created a mechanism to reimburse local governments for some costs of implementing new programs or increased levels of service.

Then, the so-called "tax revolt" changed the California Constitution: Proposition 13 limited the ability of the State of California (State) to collect property taxes; Proposition 4 (the "Spirit of 13") in part limited spending and in part enshrined new reimbursement provisions in the California Constitution. (See *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, 735 [134 Cal.Rptr.2d 237, 68 P.3d 1203]; *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 57–59 [266 Cal.Rptr. 139, 785 P.2d 522]; *Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577–1581 [15 Cal.Rptr.2d 547] (*Hayes*).)

■   Section 6 of article XIII B of the California Constitution (hereafter, section 6) provides in part that, "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of such program or increased level of service . . . ." The purpose of section 6 is to prevent the State from shifting costs of general government functions to local agencies in the wake of the tax revolt. (See *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 [61 Cal.Rptr.2d 134, 931 P.2d 312] (*County of San Diego*).)

A state requirement that an entity redirect resources is, however, not a reimbursable mandate, only a new *cost* is reimbursable. (See *County of Los Angeles v. Commission on State Mandates* (2003) 110 Cal.App.4th 1176, 1194–1195 [2 Cal.Rptr.3d 419]; *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1283–1285 [101 Cal.Rptr.2d 784] (*Sonoma*).) And shifting costs from one local entity to another is not a

reimbursable mandate. (*City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 279–280 [99 Cal.Rptr.2d 333] (*El Monte*); *City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1815 [53 Cal.Rptr.2d 521] (*San Jose*).)

But even some "new" costs are not reimbursable: "The commission shall not find costs mandated by the state . . . if, after a hearing, the commission finds any one of the following: [¶] . . . [¶] (c) The statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation." (Gov. Code, § 17556, subd. (c); see also Gov. Code, § 17513 [federal mandate also includes a state mandate where lack of state mandate "would result in substantial monetary penalties or loss of funds"].)

The Legislature enacted procedures to determine if reimbursable state-mandated costs have been imposed: The local agency files a test claim. If the Commission approves it, it determines the amount to be reimbursed; if the Commission denies it, the agency can seek review by means of a petition for writ of administrative mandate. (*County of San Diego, supra,* 15 Cal.4th at pp. 81–82.) Generally, test claims must be filed within a year of the effective date of the mandate or of the incursion of costs. (Gov. Code, § 17551, subd. (c); see Cal. Code Regs., tit. 2, § 1183, subd. (c); but see Gov. Code, § 17573 [tolled while procedure for referring the issue to the Legislature is employed].) The failure to exhaust these administrative remedies bars a party from seeking court relief. (*Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 639–640 [21 Cal.Rptr.2d 453] (*Central Delta*).)

■ A Commission determination that a cost results from an unfunded state mandate does not necessarily mean the Legislature will pay for it. If the Legislature does not pay, with a favorable Commission determination in hand, an entity may seek a court order that it no longer has to obey the mandate: "If the Legislature refuses to appropriate money to satisfy a mandate found to be reimbursable by the commission, a claimant may bring an action for declaratory relief to enjoin enforcement of the mandate. ([Gov. Code], § 17612, subd. (b).)" (*Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 833–834 [244 Cal.Rptr. 677, 750 P.2d 318] (*Lucia Mar*); see 9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 122, pp. 179–180; see also Gov. Code, § 17581 [entity may decline to obey such mandate when Legislature identifies it in a budget bill as a mandate for which reimbursement will not be made].)

In 2004 and 2007, other mandate mechanisms were adopted, but they do not apply here. (§ 6, subds. (b), (c), added by Prop. 1A, eff. Nov. 3, 2004; Gov. Code, § 17572 et seq.; Stats. 2007, ch. 329, § 11.)

### B. Special Education

The general contours of the special education laws are not disputed in this case and have been summarized as follows:

■ "Enacted by Congress in 1975 as the Education of the Handicapped Act, the Individuals with Disabilities Education Act ('IDEA'), 20 U.S.C. § 1400, was renamed in 1990. Its primary objective is 'to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . .' [Citation.] To accomplish this goal, the statute 'provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures.' [Citation.]

"Among the substantive procedures is the development of an individual-ized education program ('IEP') for each child with a disability. . . .

"California state law also has a regulatory scheme for special education with the express intent of assuring that all individuals with exceptional needs receive their rights to appropriate programs and services under the IDEA. Cal. Educ. Code § 56000. . . . [¶] . . . [¶]

"The IDEA also contains numerous procedural safeguards. Parents or guardians of a disabled child must be notified of any proposed change in the identification, evaluation, or educational placement of the child. [Citation.] Parents must also be provided an opportunity to present a complaint 'with respect to any matter' relating to the proposed change. [Citation.] . . .

"Any party aggrieved by the findings and a final decision has the right to bring a civil action in state or federal court." (*County of San Diego v. Cal. Special Educ. Hearing* (9th Cir. 1996) 93 F.3d 1458, 1461–1462; see generally *County of Los Angeles v. Smith* (1999) 74 Cal.App.4th 500, 507–514 [88 Cal.Rptr.2d 159] (*Smith*).)

### C. Standard of Review

It is well settled that on demurrer "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the

truth of contentions, deductions or conclusions of law." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317] (*Aubry*).)

As we will describe shortly, Grossmont's complaint pleads the effect of state and federal laws, an unnamed superior court decision, and an implementing directive by the Department. However, as just stated, we do *not* assume the truth of pleaded "conclusions of law." (*Aubry, supra,* 2 Cal.4th at p. 967; *Berry v. State of California* (1992) 2 Cal.App.4th 688, 691 [3 Cal.Rptr.2d 382].)

In determining whether a complaint states a cause of action an appellate court may consider matters judicially noticeable. (*County of Lassen v. State of California* (1992) 4 Cal.App.4th 1151, 1153 [6 Cal.Rptr.2d 359] (*County of Lassen*).) This may include a court decision in another case referred to in the complaint and an official act of government (Evid. Code, § 452, subds. (c), (d)), and such facts will negate contrary facts alleged in the complaint (*Colvig v. RKO General, Inc.* (1965) 232 Cal.App.2d 56, 63–64 [42 Cal.Rptr. 473] [court decision]; *Pratt v. Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 143–144 [39 Cal.Rptr. 332] [official acts of government]). We considered taking judicial notice of the superior court case and executive directive described in the complaint, but concluded it was not necessary to do so in this case.

### D.   The Complaint

On February 1, 2006, Grossmont, a public school district in the County, filed its complaint seeking declaratory and injunctive relief and specific performance. Although the Department is the only named defendant, the complaint refers to the claimed liability of the State itself. We do the same.

The complaint alleges that the State owed Grossmont the ever-increasing costs of educating special education students. "Special Education" refers to "an individualized education" for each disabled student, but also includes related medical and other services. The State receives federal funds for such services. "[I]n order to qualify for federal funds, states must mandate their LEAs [local educational agencies] provide disabled students with an individualized free and appropriate education (FAPE) and related services. If a state qualifies, and accepts federal funds, its LEAs become responsible to provide FAPE and related services to any disabled student within the LEA's boundary."

"FAPE" is also sometimes translated as "free appropriate public education." (See Ed. Code, § 56000; *Smith, supra,* 74 Cal.App.4th at p. 511.)

Special education results in high costs, such as the cost of preparing and administering IEP's (individualized education programs) for each student, and the administration of parent-school dispute procedures, including the need to pay lawyers and pay the legal bills of parents who succeed in court challenges. Special education teachers must have a higher level of training than other teachers, classes must be smaller and more teachers and aides are needed than in regular classes. In some cases Grossmont must pay to place students in private schools, which are expensive.

Grossmont pleads that although the State has a mechanism for seeking reimbursement (or subvention) for new programs or higher levels of service, there is no such requirement for old programs, and the State "has reduced the already deficient funding provided for education, and reassigned to school districts, including Plaintiff, responsibilities previously assigned to other agencies, without any corresponding increase in funding," compelling Grossmont "to use regular education money to fund special education thereby reducing the amount of regular education money and services."

Grossmont alleges that required mental health services for special education students had been provided by "San Diego County Mental Health . . . pursuant to what is commonly known as AB 2726 and AB 3632 services," and this "reduced the burden upon the school district to provide[]" those services. "AB 3632" refers to the adoption of what is now chapter 26.5 of division 7 of title I of the Government Code, section 7570 et seq., entitled "Interagency Responsibilities for Providing Services to Children With Disabilities," and "AB 2726" made amendments to that chapter. (Stats. 1984, ch. 1747, p. 6370; Stats. 1996, ch. 654, p. 3654.)

Grossmont pleads that in 2003 the State reduced the funding for such mental health services to $1,000, statewide. Grossmont pleads:

"16. . . . San Diego County, with other counties, sued the state under the mandated costs provision of the California Constitution. The Superior Court found that the mandated services were unfunded, within the meaning of the Constitution, and entered an order permitting San Diego County to cease providing those . . . mental health services.

"17. In response to the court ruling permitting the County to stop paying for mental health related services for disabled students, the [Department] issued a statement that it expected the school districts to provide and pay for the mental health services previously provided by the County because the school districts are by statute required to provide these services. This resulted in a sharp increase in expenses with no additional funding from the state to pay the expense.

"18. This transfer of responsibility without a corresponding increase in funding violated the Constitution. . . ."

Grossmont then pleaded that this violated an *appropriations* limit. We address that point in part II.A.1., *post.*

The complaint alleges "shortfalls" of millions of dollars per year, and that "the encroachments will be increasing because the costs of Special Education are on a systematic incline while the funding is being reduced." The gap is filled by cutting programs for regular students and other measures.

The complaint makes the following allegation: "21. Proposition 98 was passed by the voters, and amended by Proposition 111, to provide a Constitutional guarantee of a minimum of funding for public schools and community colleges. That Constitutional guarantee of minimum funding for public schools has been violated by the State of California."

Grossmont does not claim the State is diverting federal money to other uses, it pleads both governments are providing too little money.

The complaint purports to state three "causes of action." The trial court concluded the complaint merely states three legal theories arising from the purported violation of a single primary right. (See *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795–796 [126 Cal.Rptr. 225, 543 P.2d 593]; *Walton v. Walton* (1995) 31 Cal.App.4th 277, 291 [36 Cal.Rptr.2d 901]; 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 24–26, pp. 85–88.) We need not resolve that issue, although it leads to a procedural point we discuss in part II.B., *post.*

In its first theory, Grossmont seeks a declaration that the State has violated funding laws and therefore Grossmont "is no longer required to spend non-Special Education funding to comply with the Special Education provisions of the Education Code because of insufficient funding from" the State and federal government. The prayer phrases this as a declaration "setting forth the rights and duties of the parties in this case, and specifically an order declaring that [Grossmont] is no longer required to spend non-Special Education funding to comply with the Special Education provisions of the Education Code because of insufficient funding from the State of California and the Federal Government."

In its second theory, Grossmont alleges it is a third party beneficiary of the state-federal special education funding laws; the federal government breached its duty to fund special education, and the State, by failing to sue the federal government, was liable for the difference. Grossmont filed a government claim raising the contract issue. (See Gov. Code, § 905.2; *Crow v. State of*

*California* (1990) 222 Cal.App.3d 192, 199 [271 Cal.Rptr. 349] [government claim statute applies to contract actions].) In its prayer Grossmont asks for specific performance "by the State," that the State pay "the amounts to [Grossmont] that are required by the agreement between the [State] and the Federal government thereby permitting [Grossmont] to provide for funded services to both its special and regular education students."

In its third theory, Grossmont alleges an equal protection violation, claiming more money was spent on special education students, but "There is no rational basis for reducing the educational services provided" to regular students. The prayer seeks "damages sufficient to permit [Grossmont] to provide an appropriate education to each of its regular education students . . . ."

### E. Demurrer and Appeal

The Department demurred to the *first* "cause of action" based on lack of exhaustion of remedies, and because the costs were a federal mandate, but demurred to the second and third purported causes of action on other grounds.

The trial court issued a tentative decision on August 29, 2006, which became the final ruling when neither party requested oral argument. In its final ruling the trial court concluded that Grossmont's failure to exhaust administrative remedies by submitting its claims to the Commission defeated all of Grossmont's theories; it also found Grossmont was not a third party beneficiary of the federal-state agreement, it lacked standing to assert the equal protection claim, and that the alleged funding inequality between special education and regular students did not state a viable equal protection claim.

The judgment, filed nine months later on May 29, 2007, however, recites only that Grossmont failed to exhaust remedies. The record does not explain the reason for the delay in preparing the judgment, nor why it does not recite all of the reasons stated in the trial court's final ruling.

Grossmont timely filed its notice of appeal.

### II. DISCUSSION

In part II.A., we conclude Grossmont's central claim must first be submitted to the Commission, and that if we accepted Grossmont's claim that it would be futile to do so, Grossmont's complaint would still not state a valid claim. In part II.B. we reject Grossmont's claim that the trial court deprived it

of due process. In part II.C. we explain why portions of the complaint that might not be barred by the failure to exhaust remedies fail to state a cause of action for other reasons.

#### A. Grossmont Cannot Sue for Reimbursement

##### 1. Failure to Exhaust Remedies

The complaint does not allege that Grossmont filed a claim with the Commission, and impliedly asserts that Grossmont did not do so. (Cf. *County of Lassen, supra,* 4 Cal.App.4th at p. 1157.) In its opposition to the demurrer Grossmont conceded it had not done so. On appeal Grossmont argues that its claim is outside the ambit of the Commission because it is *not* seeking costs that stem from either a "new program" or a "higher level" mandated by the State, but rather from long-standing federal mandates.

Where Grossmont goes wrong, in part, is in the word "new." Grossmont claims "Special Education was enacted in California in 1976, and amended several times, but the current mandate is from 1980." But Grossmont alleges that after the *2003* funding reduction, a superior court judgment held these services *were* an unfunded mandate and relieved the County (and other counties) of the need to comply therewith, leading to the departmental directive requiring Grossmont to pay those costs.

We read the complaint to mean that the Department's communication to Grossmont amounted to a mandate. (See *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 174–175 [275 Cal.Rptr. 449] [term "mandates" read broadly to mean " 'orders' or 'commands,' concepts broad enough to include executive orders as well as statutes"].)

By statute, county mental health departments must assess the needs of and provide mental health services to disabled students. (Gov. Code, § 7576, subd. (a).) As pleaded in Grossmont's complaint, and as recited in a published case, the major funding for such services was by the State, to the amount of millions of dollars per year, but in "the 2002–2003 fiscal year, that funding was reduced to $1,000 statewide." (*Tri-County Special Educ. Local Plan Area v. County of Tuolumne* (2004) 123 Cal.App.4th 563, 570 [19 Cal.Rptr.3d 884] (*Tri-County*).)

Although not necessary to the decision, *Tri-County* describes the judgment mentioned in Grossmont's complaint as a Sacramento County Superior Court case that held: " '[San Diego, Sacramento, Orange and Contra Costa Counties] need not provide the AB 3632 or AB 2726 services absent adequate, good faith funding from the State.' Respondents have advised this court that

the Sacramento County judgment has become final by virtue of the failure of any party to file a notice of appeal in a timely manner." (*Tri-County, supra,* 123 Cal.App.4th at p. 572, fn. 1.) The parties do not contest this description and it conforms to Grossmont's complaint.

Grossmont's complaint states, "The Superior Court found that the mandated services were unfunded, within the meaning of the Constitution, and entered an order permitting San Diego County to cease providing those . . . mental health services." The only legal basis to justify such an order would be by finding the existence of an unfunded state mandate. (Gov. Code, § 17612, subd. (c).) Thus, by finding that San Diego (and the other counties) did not have to pay for mental health services, the Sacramento County Superior Court necessarily found those services were an unfunded *state* mandate.

Those are the very services that Grossmont's complaint pleads amount to a *federal* mandate, *and for that reason* are not within the Commission's authority. But as we have stated, in reviewing a demurrer, we need not accept as true legal conclusions stated in a complaint. Here, the *facts* in the complaint, namely, the fact that the superior court relieved San Diego of the need to provide mental health services, compels the legal conclusion that those services were found by the superior court to be a unfunded *state* mandate, not a federal mandate.

We do not say that we agree with such legal conclusion, because that issue is not properly before this court at this time; we say that the complaint itself, properly understood, undermines Grossmont's claim that submission of the controversy to the Commission is "futile" because it is *certain* that the Commission will find the mandates to be federal mandates.

■ In *Hayes* we explained that the federal special education laws left many details open, and to the extent the State chose to allocate a cost to a local school, such cost might be a reimbursable state mandate. (*Hayes, supra,* 11 Cal.App.4th at pp. 1592–1595.) We declined to assess the nature of such mandates in the first instance: "The [Commission] is the entity with the responsibility for considering the issues in the first instance and which has the expertise to do so." (*Id.* at pp. 1596–1597.) We follow the same course in this case. Submitting a claim to the Commission is the *exclusive* method for resolving whether a cost is or is not a reimbursable state mandate. (*Lucia Mar, supra,* 44 Cal.3d at pp. 833–834; *Lake Madrone Water Dist. v. State Water Resources Control Bd.* (1989) 209 Cal.App.3d 163, 175–176 [256 Cal.Rptr. 894].) "Until appellants have exhausted their administrative remedy before the commission, appellants cannot know whether the statute imposes a state-mandated cost, as they contend." (*Central Delta, supra,* 17 Cal.App.4th at p. 641.)

■ We are also aware that the duties of counties and school districts may differ with respect to federal law. A federal law provides in part that "If a public agency other than an educational agency fails to provide or pay for the special education and related services . . . the local educational agency . . . shall provide or pay for such services . . . ." (20 U.S.C. § 1412(a)(12)(B)(ii).) But the trial court found that some of the burden shifted from the counties to local school districts "could qualify as [a] 'higher level of service.' " It is for the Commission to sort these matters out: "There is no precise formula or rule for determining whether the 'costs' are the product of a federal mandate." (*County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 907, fn. 2 [58 Cal.Rptr.3d 762]; see *id.* at p. 914 ["the existence of a federal, as contrasted with a state, mandate is not easily ascertainable"].)

We take further guidance from *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62 [222 Cal.Rptr. 750] (*County of Contra Costa*). There, as here, public entity claimants had filed an action in Sacramento County Superior Court, seeking a declaration that a number of laws were unenforceable because they created unfunded mandates. (*Id.* at pp. 66–67.) In order to avoid the bar of failure to exhaust administrative remedies, the claimants argued they did not need to submit the dispute to the State Board of Control, or its then-recent successor, the Commission, because they were challenging the constitutionality of the laws. (*Id.* at pp. 74–75.) We rejected that claim: "[T]he fact that a constitutional provision is self executing does not relieve a party from complying with reasonable procedures for assertion of the right." (*Id.* at p. 75.) The Commission "has the power to determine whether a statute or regulation mandates a new program, or higher level of service of an existing program and whether there are any 'costs' mandated by the legislation. A proceeding before the [Commission] will promote judicial efficiency by unearthing the relevant evidence and providing a record which the court may review. [Citation.] It is still the rule that a party must exhaust administrative remedies even though, if unsuccessful, he intends to raise constitutional issues in a judicial proceeding." (*Id.* at p. 75, fn. 8.)

We also rejected the claim that submission of the matter to the Commission would be "futile," emphasizing that the futility exception applies only when it can be shown that an agency's decision is *certain* to be adverse. (*County of Contra Costa, supra,* 177 Cal.App.3d at pp. 77–78; see *White v. State of California* (1987) 195 Cal.App.3d 452, 475–477 [240 Cal.Rptr. 732] (*White*).) Here, we cannot *know* that the Commission will find that the costs complained of are unreimbursable mandates. (Cf. *County of San Diego, supra,* 15 Cal.4th at p. 90 [Commission had rejected identical claim].)

■ Accordingly, Grossmont's failure to exhaust an available administrative remedy bars this civil complaint.

We note that *Tri-County* found the agency in that case had not complied with a separate exhaustion requirement. (*Tri-County, supra,* 123 Cal.App.4th at pp. 574–576.) Briefly, the federal law provides that where another public agency fails in its duty to provide "special education and related services," although the local educational agency must perform that duty, it may seek relief against the other agency. (20 U.S.C. § 1412(a)(12)(B)(ii).) *Tri-County* explains the California procedures to seek this relief, leading to action by the Superintendent of Public Instruction. (*Tri-County, supra,* at pp. 574–576.) We express no views about this procedure in this case, because Grossmont has not named the County as a defendant.

### 2. Suing the State in General

Putting aside the discussion in part II.A.1., *ante,* Grossmont assumes that if it can avoid going to the Commission, it can sue, claiming: "The [Department] does not . . . say what should happen, where the school district (like Grossmont here) is not claiming section 6 reimbursement. So the lawsuit should be permitted to continue . . . ." We disagree. In such case, Grossmont has pleaded itself out of court.

■ The allegation that the Legislature is not providing enough funding for special education is not a basis for a lawsuit. How much money to collect and how to spend it are matters entrusted to the Legislature, not the judiciary. (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1214 [70 Cal.Rptr.2d 745] ["The enactment of a budget bill is a legislative function; it is both a right and a duty that is expressly placed upon the Legislature and the Governor by our state Constitution."].)

■ "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited.' [Citation.]

"Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered

by the language used.' " (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161]; see *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 523 [36 Cal.Rptr.3d 142, 123 P.3d 169].)

As phrased in an unfunded mandate case, "When considering the Legislature's considerable powers regarding budget and tax matters, 'the Legislature, not this court, decides which of the innumerable public mouths tax revenues will feed. Barring a statutory or constitutional violation, it is not for this court to stop the Legislature if it transfers revenue from Peter to compensate Paul . . . .' " (*Sonoma, supra,* 84 Cal.App.4th at p. 1281; see *San Jose, supra,* 45 Cal.App.4th at pp. 1816–1817 ["there is no basis for applying section 6 as an equitable remedy to cure the perceived unfairness resulting from political decisions on funding priorities"].)

Thus, because the Legislature is generally free to fund or not fund programs, Grossmont must identify some duty stemming from the California Constitution or federal law that limits the Legislature's broad authority to decide how to spend money.

In its complaint, Grossmont made reference to the failure of the State to make an appropriation, as follows: "18. This transfer of responsibility without a corresponding increase in funding violated the Constitution. Article XIIIB, [section] 3, states in part, 'In the event that the financial responsibility of providing services is transferred . . . from one entity of government to another, then for the year in which such transfer becomes effective the appropriations limit of the transferee entity shall be increased . . . .' [Grossmont] did not receive any additional funds to pay for the transfer of the services previously provided by the County of San Diego."

Grossmont mixes apples and oranges, and misquotes the relevant constitutional provision, which in full reads: "In the event that the financial responsibility of providing services is transferred, in whole or in part, whether by annexation, incorporation or otherwise, from one entity of government to another, then for the year in which such transfer becomes effective the appropriations limit of the transferee entity shall be increased by such reasonable amount as the said entities shall mutually agree and the appropriations limit of the transferor entity shall be decreased by the same amount." (Cal. Const., art. XIII B, § 3, subd. (a).)

This provision allows a public entity to increase its *appropriations limit* when costs are shifted from another entity and the other entity's limit is lowered so that the taxpayer does not pay anything extra. (See *Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 107–110 [211

Cal.Rptr. 133, 695 P.2d 220].) This prevents "a government entity from spending more on programs funded with taxes than it spent in the prior year, adjusted for inflation and population changes." (*El Monte, supra*, 83 Cal.App.4th at p. 271; see *County of Placer v. Corin* (1980) 113 Cal.App.3d 443, 446 [170 Cal.Rptr. 232] ["the thrust of article XIII B is toward placing certain limitations on the growth of appropriations at both the state and local government level . . ."].) We fail to see how this provision pertains to *reimbursements* by the State. Further, nowhere in its briefs does Grossmont discuss this provision, therefore whatever claim it meant to make is forfeited. (See *Marvin Lieblein, Inc. v. Shewry* (2006) 137 Cal.App.4th 700, 708, fn. 2 [40 Cal.Rptr.3d 547] (*Marvin Lieblein*); *Diamond Springs Lime Co. v. American River Constructors* (1971) 16 Cal.App.3d 581, 608 [94 Cal.Rptr. 200].) The only relevance we perceive is that if the Commission finds the expenses are federally mandated, Grossmont's appropriations limit would be lifted, pro tanto. (Cal. Const., art. XIII B, § 9; see *City of Sacramento v. State of California, supra*, 50 Cal.3d at pp. 59, 76–77.)

■ Similarly, nowhere in its briefs does Grossmont explain the requirements of Proposition 98 or 111, mentioned in the complaint, nor how those requirements have been violated, nor how Grossmont has a civil claim for their purported violation. Grossmont mentions these propositions in its "Statement of the Case," but merely summarizes the unanalyzed conclusion stated in the complaint, quoted earlier, that these provisions have been violated. We are not required to interpret the possible application of these provisions absent briefing by Grossmont. Therefore this claim, too, is forfeited. (*Marvin Lieblein, supra*, 137 Cal.App.4th at p. 708, fn. 2.) Further, we have previously considered Proposition 98 and concluded it "does not deprive the Legislature of its plenary authority over education and does not grant school districts political autonomy or a proprietary interest in the minimum funding to be applied by the state for support of school districts and community colleges." (*California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1534–1535 [7 Cal.Rptr.2d 699] (*CTA*).) Another court has observed that after Proposition 98's adoption and modification by Proposition 111, "The power to appropriate funds was left in the hands of the Legislature. . . . We perceive no intent in Proposition 98's concern for an appropriate level of funding for education that would tie the hands of the Legislature in meeting that goal, particularly in years of low revenues." (*Sonoma, supra*, 84 Cal.App.4th at pp. 1289–1290.) Given these holdings, and Grossmont's failure to discuss Proposition 98 in its briefs, we see no reason to address Propositions 98 and 111 further.

The only state *constitutional* mechanism for forcing reimbursements discussed in the briefs is via the Commission. If we agreed Grossmont had no valid claim there, as Grossmont maintains, then it pleaded itself out of court, because Grossmont does not identify any other constitutional provision or

federal law compelling the reimbursements or declaratory relief it seeks, and under the California Constitution, the judiciary has no general authority to compel appropriations or second-guess legislative spending decisions.

## B.   Due Process at Demurrer Stage

Grossmont claims the trial court deprived it of due process by sustaining the demurrer on grounds not raised by the Department. Grossmont's claim is based on the Department's atypical moving papers. In the *demurrer*, the exhaustion bar seemingly was raised only against Grossmont's first purported "cause of action." However, in the *points and authorities*, the Department argued exhaustion barred the entire complaint. Grossmont claims it did not have notice that the trial court might rule the failure to exhaust remedies would apply to all "causes of action."

Even if we agreed with Grossmont that the Department's method of constructing its moving papers misled Grossmont, Grossmont was fully apprised of the trial court's determination to apply exhaustion to the entire complaint by the tentative ruling, which explicitly discussed why exhaustion would bar the entire complaint. Grossmont did not request oral argument and therefore cannot complain now that it had no chance to address the issue in the trial court.

More importantly, we review de novo whether the complaint states a cause of action and Grossmont had the opportunity to be heard on all points in its appellate briefs. (See *Tri-County, supra*, 123 Cal.App.4th at p. 575 [rejecting similar claim]; see also *Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1191 [71 Cal.Rptr.3d 87] [even if trial court's reasons wrong, if the demurrer was good, judgment will be affirmed].)

And, although not recited in the judgment, the trial court's final ruling sustained the demurrer on alternate grounds as to Grossmont's purported second and third "causes of action." It is true that we review *judgments*, not interim rulings stating a trial court's reasoning, unless in the form of a statement of decision. (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 551–552 [35 Cal.Rptr.2d 291].) But as we explain (pt. II.C., *post*), we agree with the trial court's conclusion in its final ruling that the other "causes of action" fail to state claims.

Thus, the alleged procedural irregularity was harmless. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People v. Edward D. Jones & Co.* (2007) 154 Cal.App.4th 627, 633–636 [65 Cal.Rptr.3d 130].)

## C. Other Claims Do Not State a Cause of Action

To the extent the complaint alleges claims falling outside the purview of the Commission, it fails to state *viable* claims.

### 1. Third Party Beneficiary

Grossmont claims that the State's act of accepting federal funds created a "contract," and Grossmont was an intended beneficiary; accordingly, Grossmont has the ability to sue the State for failing to demand that the federal government fully fund special education in California; the prayer sought specific performance to force payment *by* California *to* Grossmont of the federal government's shortfall.

Grossmont claims the existence of a contract was not disputed and is established for purposes of this appeal. Although whether a contract exists may be a legal conclusion, we accept the point for purposes of argument.

The heart of Grossmont's claim is as follows: "[T]he agreement between the Federal and State government imposed an obligation upon [Grossmont] to find, assess, and educate every disabled student within its boundaries. The Federal government promised to provide some money, and did provide some money, but not the amount promised. The State has promised to provide money, and has provided some money, but not the amount necessary to pay for the services mandated. The promises specifically contemplated that [Grossmont] would provide the services, and be paid for providing the services. Accordingly, [Grossmont] was the expressly intended beneficiary of the payments."

The problem with this is that the *intended* beneficiaries of the contract are the students in need of special education. The school districts, although identified as the primary provider of such services, are not themselves the object of the government benefits, they are the conduits through which the benefits flow. Grossmont's claim that the students have no interest in the *money*, only in the *services*, overlooks the fact that the money is converted into services—services *for students*. Any benefit to the schools providing those services is incidental. "In order for a contract to be enforceable by a third party, the contract must be made expressly for the benefit of the third person. (Civ. Code, § 1559.) A third party who is only incidentally benefited by performance of a contract is not entitled to enforce it. [Citation.] ' "The fact that he is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment. It must appear to have been the intention of *the parties* to secure to him personally the benefit of its

provisions." ' " (*Eastern Aviation Group, Inc. v. Airborne Express, Inc.* (1992) 6 Cal.App.4th 1448, 1452 [8 Cal.Rptr.2d 355], original italics.)

"American law generally classifies persons having enforceable rights under contracts to which they are not parties as either creditor beneficiaries or donee beneficiaries." (*Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400 [113 Cal.Rptr. 585, 521 P.2d 841] (*Martinez*); see *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 893 [38 Cal.Rptr.3d 78] (*Souza*).)

"A person is a donee beneficiary only if the promisee's contractual intent is either to make a gift to him or to confer on him a right against the promisor." (*Martinez, supra,* 11 Cal.3d at pp. 400–401; see *Souza, supra,* 135 Cal.App.4th at p. 893.) Grossmont is not a donee beneficiary, as neither the State nor the federal government had any evident intent to gift it money, or confer rights on it, rather the money was to be used to further the public purpose of helping disabled students.

"A creditor beneficiary is a party to whom a promisee owes a preexisting duty which the promisee intends to discharge by means of a promisor's performance." (*Souza, supra,* 135 Cal.App.4th at p. 894.) Grossmont does not identify any preexisting obligation, except to the extent we perceive a claim that the State is mandating services to disabled students, which brings Grossmont back against the problem of failure to exhaust remedies, discussed in part II.A.1., *ante.*

In contrast, in *White, supra,* 195 Cal.App.3d 452, we addressed a claim under the predecessor to the IDEA (Individuals with Disabilities Education Act; 20 U.S.C. § 1400 et seq.). White alleged the State had not allocated federal funds to educate handicapped students in state hospitals. We assumed that White—*a handicapped student in a state hospital*—was a third party beneficiary. (*White,* at p. 473; see *Zigas v. Superior Court* (1981) 120 Cal.App.3d 827 [174 Cal.Rptr. 806] [landlords contracting with government agreed to limit rents; tenants were third party beneficiaries].)

The fact schools may benefit from the federal-state arrangement does not make them *intended* beneficiaries. They were in effect enlisted to administer the program *on behalf of the students.* Accordingly, even if we assumed a contract existed, Grossmont is not an intended beneficiary thereof.

### 2. Equal Protection

Grossmont alleges that in absorbing the unfunded mandates described, it must use money from regular education programming, thereby depriving regular education students of *their* rights to a free appropriate public education.

Putting aside the Department's challenge to Grossmont's standing to press this claim on behalf of students (cf. *Central Delta, supra,* 17 Cal.App.4th at p. 630), we agree that the complaint fails to state an equal protection claim.

· **(13)** The essence of an equal protection claim is that two groups, similarly situated with respect to the law in question, are treated differently. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654]; *William Dal Porto & Sons, Inc. v. Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195, 1214–1215 [237 Cal.Rptr. 206].)

By definition, "special" and "regular" education students are *not* situated similarly with respect to the applicable laws. As the complaint itself pleads, special education students require special services including specially trained teachers, more teachers and instructional aides and mental health services that regular students do not need. And, as we explained at length in an earlier case, the purpose of the federal special education laws was to help states *satisfy* their responsibilities under equal protection principles to provide adequate education to disabled children. (*Hayes, supra,* 11 Cal.App.4th at pp. 1581–1592.)

Grossmont's assertion is that those laws, as engrafted onto California's school financing system—a system we have previously described as "Byzantine in its intricacy and complexity" (*CTA, supra,* 5 Cal.App.4th at p. 1525)—so badly skews Grossmont's finances as to harm regular education students.

This is not an equal protection claim, because the two classes are not similarly situated. Instead, Grossmont raises a public policy claim, "properly resolved on the other side of Tenth Street, in the halls of the Legislature." (*Osborn v. Hertz Corp.* (1988) 205 Cal.App.3d 703, 710 [252 Cal.Rptr. 613].)

## CONCLUSION

■ Notwithstanding the traditional duties of local school districts, the State bears the ultimate responsibility for ensuring basic educational equality for all California students. (*Butt v. State of California* (1992) 4 Cal.4th 668, 674, 680–681, 688–692 [15 Cal.Rptr.2d 480, 842 P.2d 1240]; *CTA, supra,* 5 Cal.App.4th at pp. 1522–1535.) Although Grossmont has not stated a viable claim in this civil suit, the Department does not deny the underlying plight Grossmont and similarly situated school districts face. The quandary described in the complaint is lamentable, but the remedy lies squarely with the Legislature, not the judiciary. Accordingly, we affirm.

## DISPOSITION

The judgment is affirmed. Grossmont shall pay the Department's cost of this appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Sims, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 15, 2009, S170384.