Filed 11/27/13  P. v. Massie CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C071666 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F5286) |
| v. | |
| SCOTT MASSIE, | |
| Defendant and Appellant. | |

A jury found defendant guilty of two counts of using threats or violence to deter or prevent an executive officer from performing official duties and one count of assaulting an officer, but deadlocked on another count.  (Pen. Code,[1] §§ 69, 241.1.)  The trial court found true two of three alleged strikes (attempted murder and assault with a deadly weapon).  The trial court struck one strike, and sentenced defendant to prison for eight years and eight months.  Defendant timely appealed.

_____

[1]  Further undesignated statutory references are to the Penal Code.

On appeal, defendant contends the trial court:  1) erred in failing to instruct on a lesser included offense; 2) incorrectly instructed on self-defense, and 3) made sentencing errors.  He also asks us to review the transcript of an in-camera hearing regarding the disclosure of peace officer personnel files.  We find no error, and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 7, 2010, defendant refused to leave his jail cell to attend his arraignment.  Three law enforcement officers entered his cell to address his refusal.  The ensuing altercation between the deputies and defendant is the subject of the instant case.

*Trial Testimony*

Deputy Dan Martin was assigned as the holding cell bailiff for the arraignment calendar that afternoon.  Defendant was cooperative during the walk from the jail--attached to the courthouse--to the holding cell, but became defiant when he learned he was going to be charged with a felony, instead of a misdemeanor.  Martin took the other inmates out of the cell both to see if being alone would "de-escalate" defendant, and to "get them started on their arraignments."  About 15 minutes later, defendant continued to be defiant and to curse, and said he was not going to court.  Defendant was returned to the jail with the aid of three staff members.  According to Deputy John Zufall, defendant "was very agitated and angry.  He did not want to go to court.  He felt the charges against him were unjustified."  After the 2:00 p.m. calendar was finished, at around 3:00 p.m., Martin "radioed back to have him sent back down."

Joseph Baker, a jail services officer, testified that when he used the intercom to tell defendant he was going back to court, defendant replied, "'You can tell them to suck my dick'" and "'You guys better stretch out and be ready to fight.'"  Baker saw deputies Zufall, Arik Amaya, and Brian Walker, enter defendant's cell and heard defendant refuse to go to court and yell at the deputies, but the acoustics made it impossible for Baker to

2

understand anything else. About two minutes later, Baker asked if the deputies were all right, and they asked him to send medical aid.

Zufall, Walker and Amaya discussed how to get defendant out of his cell, and asked him to get ready for court. Defendant had taken off the clothing he had been wearing when first taken to court, was only wearing boxers, and "'Basically said, fuck you.'" He had wet the floor and himself with soap, a tactic inmates use to fight jailers: "They'll get everything wet and soapy and so we can't have good footing and we will slip and fall and hurt ourselves and it's easier for them to hurt us." The deputies "gave him several chances" to comply and asked him to kneel on his bunk so they could handcuff him, but he refused, daring them to come into the cell and get him.

Amaya opened the door, Walker entered with a Taser, and Zufall entered behind Walker, followed by Amaya. Walker shot defendant with the Taser, but it had no effect, because the darts were blocked by a towel defendant held up. Defendant laughed, dropped the towel and raised his fists and said, "it didn't work. Now you're going to have to fight me." Zufall walked around Walker to seize defendant's hand; when defendant tried to punch him, Zufall tried to control him and the two went down fighting onto a bunk. Defendant was screaming and "kept saying, I'm going to kill you. I'm going to fuck you guys up." Amaya and Walker hit defendant with batons while yelling at him to stop resisting. After a minute, defendant said, "okay. I'm done. I give up."

Defendant had a cut on his head, contusions on his back, shoulder, and rib cage, and his elbow "had a golf ball size contusion" due to Zufall's arm-hold and the baton strikes. The defense introduced photographs taken on June 22, 2010, depicting defendant's injuries. A nurse testified he had a collapsed lung, and was disoriented, most likely from a concussion due to his head injury.

Zufall testified that the jail can be warm in June, and it is not uncommon for inmates to wear nothing but boxers, and inmates can pass each other drinks from cell to cell. Ayala testified that if a cell extraction team had been called, a sergeant would have

3

been involved and the incident would have been videotaped, but he added that generally a team is called when an inmate blocks cell doors or covers their windows, making it impossible to know whether they have a weapon; in contrast, "this whole incident pretty regularly happens in the jail, people not wanting to go to court." He did concede that the jail's written policy for cell extractions could cover this incident, and that it was uncommon to forcibly remove someone who simply refuses to go to court. Zufall was recalled to the stand and testified he *did* consult with a sergeant, but no cell extraction team was needed, because defendant had not barricaded himself in, and Zufall thought the three deputies could handle defendant. Calling the cell extraction team required bringing the "entire jail . . . to a standstill" and would be impractical "every time one person doesn't want to go to court."

Robert James, who had been convicted of manslaughter with use of a gun, and who had been in the jail on the day of the incident and continuously thereafter, testified he heard defendant tell someone over the radio "to tell the judge to suck his dick." Soon after, Walker, Amaya and Zufall, went toward defendant's cell, and James heard defendant asking "what are you doing" and "leave me alone," and then heard the "pop" of a Taser. He heard "an altercation. It sounded really brutal. It was loud. It would also be called a beating." James testified he had "not really" talked to anyone about the incident, but conceded on cross-examination that he had spoken to a defense investigator and to defendant, and had heard defendant's version of the events, and had spoken to a "couple of" other people in the jail. He denied defendant told him what to say.

*Defendant's Testimony*

Defendant testified he was "shocked and basically stunned" to be caught up in the underlying case, which is why he "said that bad thing about the judge" and did not want to go to court. His words about fighting had been misunderstood, he had merely told the radio operator that he was stretched out reading, he was not willing to go to court, and "there was no reason to fight[.]" A fellow inmate passed him some water, but it spilled

4

onto the floor. When the three officers approached, defendant asked if they were going to take him to court in his underwear, but Zufall said, "no, we're not here to do that[,]" then the officers began screaming at defendant to kneel on his bed. Instead, he sat down on his bed. When the officers came in, Walker entered in "attack position" in front of defendant, with Zufall next to Walker, then Amaya came in, pushing Zufall. Defendant did not pick up the towel until Walker pointed the Taser "ten inches from my face." Walker tased defendant and then Zufall grabbed defendant's wrist. Defendant testified that he was "not resisting" and "not putting up any kind of a fight." As Zufall held defendant in a control hold, Amaya began hitting defendant with his baton, over 30 times. When the beating ended, the deputies cursed at defendant and laughed at him. Defendant had 69 staples and four stitches in his head, marks around his eye, lacerations on his back and shoulder, his elbow was dislocated, he had a couple of broken ribs and a punctured lung, and he spent a week in the hospital.

Defendant conceded he was familiar with court procedures and knew the first appearance (to which he had refused to go) was to get a lawyer and set further dates, and in 1995 he had been convicted of three felonies involving moral turpitude. He had written a letter to inmate Terry Cobb, to "jog his memory" about the incident.

*Closing Arguments*

The People argued there were "two diametrically opposed versions of what happened" and emphasized defendant's felony convictions, and knowledge of the court system, and the felony conviction of defense witness James, to argue defendant's version lacked credibility. Further, defendant's testimony about being struck 30 times was not supported by the photographic exhibits, and defendant wrote a letter to an inmate purporting to explain what happened, showing defendant was trying to plant support for his story. Defendant threatened to fight the deputies, showing he was trying to prevent Zufall and Amaya from carrying out their duties. Defendant later assaulted Zufall by

5

punching at him after dropping the towel--which protected him from the Taser--and saying they would have to fight him.

The defense emphasized the prosecution's burden of proof beyond a reasonable doubt, and argued Zufall and Amaya were not lawfully performing their duties, because escorting an inmate to court is not the same as forcibly extracting an inmate from a cell, which in counsel's view was unnecessary: Instead, they went in to the cell to beat defendant for his insubordinate behavior, partly corroborated by the testimony suggesting they should have used an extraction team if their intention was simply to remove defendant from the cell, and they were lying as part of "the thin blue line." Defense counsel emphasized the extent of defendant's injuries as supporting the view that he was not *fighting* the officers, he was being *beaten* by them.

*Verdicts*

The jury convicted defendant of two counts of using threats to deter or prevent an executive officer in the performance of lawful duties (§ 69, count 1, Zufall & count 5, Amaya), and one count of assaulting an officer (§ 241.1, count 3, Zufall), but deadlocked on another charge (§ 69, count 2, Baker).[2]

**DISCUSSION**

I

*Lesser-Included Offense*

Defendant's first contention is the trial court should have instructed on the lesser offense of willfully resisting a peace officer in the performance of official duties (§ 148, subd. (a)(1)) as to counts 1 and 5, which alleged violations of section 69. After the briefing in this case was completed, our Supreme Court decided *People v. Smith* (2013) 57 Cal.4th 232 (*Smith*), addressing the interplay of these two statutes:

_____

[2] Before trial began, the People dismissed count 4.

6

"Section 148(a)(1) is not a lesser included offense of section 69 based on the statutory elements of each crime. Section 69 states: 'Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment.' We have explained that section 69 'sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' [Citation.]

"The first way of violating section 69 'encompasses attempts to deter *either* an officer's *immediate* performance of a duty imposed by law *or* the officer's performance of such a duty at some time *in the future*.' [Citation.] The actual use of force or violence is not required. [Citation.] Further, 'the statutory language [of the first clause of section 69] does not require that the officer be engaged in the performance of his or her duties at the time the threat is made. . . . Thus, for example, a person who telephones an off-duty officer at his or her home and threatens to kill the officer if he or she continues to pursue a lawful investigation the following day or week may be convicted of the first type of offense under section 69, even though the officer was not engaged in the performance of his or her duties at the time the threat was made.' [Citation.]

"The second way of violating section 69 expressly requires that the defendant resist the officer 'by the use of force or violence,' and it further requires that the officer was acting lawfully at the time of the offense. [Citation.]

"Section 148(a)(1) is similar to the second way of violating section 69 but is clearly different from the first way of violating section 69. Section 148(a)(1) says: 'Every person who willfully resists, delays, or obstructs any public officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.'

"A person who violates section 69 in the second way-by 'knowingly resist[ing], by the use of force or violence, such officer, in the performance of his duty'-also necessarily violates section 148(a)(1) by 'willfully resist[ing] . . . any public officer . . . in the discharge or attempt to discharge any duty of his or her office or employment.' (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 257 (*Lacefield*) ['it appears to be impossible to violate the second type of offense in

7

section 69 without also violating section 148(a)(1) . . . .'].) But it is possible to violate section 69 in the first way-by attempting, through threat or violence, to deter or prevent an executive officer from performing a duty-without also violating section 148(a)(1). A person who threatens an executive officer in an attempt to deter the officer from performing a duty 'at some time *in the future*' [citation] does not necessarily willfully resist that officer in the discharge or attempt to discharge of his or her duty under section 148(a)(1). Accordingly, section 148(a)(1) is not a lesser included offense of section 69 based on the statutory elements of each offense. [Citations.] We disapprove *Lacefield* to the extent it held that section 148(a)(1) is a necessarily lesser included offense of section 69 based upon the statutory elements of those offenses. [Citation.]

"But in determining whether a trial court has a duty to instruct the jury on lesser offenses, we also consider the language of the accusatory pleading. [Citation.] If the accusatory pleading in the present case had charged only the first way of violating section 69-i.e., that defendant attempted, through threat or violence, to deter or prevent an executive officer from performing a duty-section 148(a)(1) would not have been a necessarily included offense. But the amended information charged defendant with both ways of violating section 69. In addition to the first way of violating the statute, the accusatory pleading also alleged that defendant violated the statute in the second way by 'knowingly resist[ing], by the use of force or violence, such officer, in the performance of his duty.' As explained above, section 148(a)(1) is necessarily included within this second way of violating section 69." (*Smith*, *supra*, 57 Cal.4th at pp. 240-242.)

"Where an accusatory pleading alleges both ways of violating section 69, the trial court should instruct the jury that if it finds beyond a reasonable doubt that a defendant committed either way of violating section 69, it should find the defendant guilty of that crime. If not, the jury may return a verdict on the lesser offense of section 148(a)(1) so long as there is substantial evidence to conclude that the defendant violated section 148(a)(1) without also violating section 69." (*Smith*, *supra*, 57 Cal.4th at pp. 244-245.)

*Smith* reiterated the traditional rule that "a trial court is not required to instruct the jury on a necessarily included lesser offense '"when there is no evidence that the offense was less than that charged."'" (*Smith*, *supra*, 57 Cal.4th at p. 245; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Therefore, under *Smith*, *if* the accusatory pleading charged the defendant with both prongs of section 69 (using threats or violence to deter or prevent an officer, and forcibly resisting an officer), *and* there was evidence from which a jury could rationally find he committed the lesser offense only

8

(resisting an officer without force), the trial court should have instructed on the lesser offense. (*Smith*, *supra*, 57 Cal.4th at pp. 244-245.)

Here, the information alleged both ways of violating section 69, as to counts 1 and 5, in which the information alleged defendant "did willfully and unlawfully attempt by means of threats and violence to deter and prevent [Zufall or Amaya, respectively], who was then and there an executive officer, from performing a duty imposed upon such officer by law, *and did knowingly resist by the use of force and violence said executive officer in the performance of his/her duty*." (Emphasis added.) For purposes of argument, we shall assume substantial evidence existed of the lesser charge (§ 148, subd. (a)(1)) that did not establish the greater charge (§ 69).

However, a significant intervening event took place before jury deliberations. During the instructional conference, the prosecutor made an explicit election to *drop* the second prong of the section 69 allegations, and sought to have the jury instructed on and only on the first prong, and the trial court stated on the record that this would obviate any need to instruct on section 148. In effect, the election amounted to an amendment of the information, to which defense counsel stated he had "no objection."

Accordingly, the People submitted amended jury instructions on the charges, which omitted the "resisting" prong of section 69, and the trial court read those amended charges to the jury. For example, the trial court instructed the jury: "Count 1, deter or prevent an executive officer, in violation of Section 69 of the Penal Code, a felony. Defendant Scott Massie, on or about June 7, 2010, did willfully and unlawfully attempt by means of threats to deter and prevent Shasta County Sheriff's Deputy John Zufall who was then and there an executive officer from performing a duty imposed upon such officer by law." As is clear, the second prong of section 69, referring to knowing resistance by force, was omitted. Further, the trial court instructed the jury on and only on the elements pertaining to the first prong. Thus, in our view, although the information

9

itself was not *formally* amended, because the charges were effectively narrowed to allege only the first prong of section 69, the trial court had no duty to instruct on section 148.[3]

Defendant seizes on one portion of the section 69 instruction as given by the trial court, in an effort to show it did *not* preclude liability under section 148.

The trial court instructed using a modification of CALCRIM No. 2651 as follows:

> "The defendant is charged in Counts 1, 2 and 5 with trying to defer or prevent an executive officer from performing that officer's duty in violation of Penal Code Section 69. To prove that the defendant is guilty of this crime, the People must prove that; one, the defendant willfully and unlawfully used a threat of violence to try to prevent or deter an executive officer from performing the officer's lawful duty; and two, when the defendant acted, he intended to prevent or deter the executive officer from performing the officer's lawful duty. Someone commits an act willfully when he or she does it willingly or on purpose.

> "An executive officer is a governmental official who may use his or her discretion in performing his or her job duties. A service officer, peace officer and a corrections officer, are each an executive officer. The executive officer does not need to be performing his or her job duties at the time the threat is communicated.

> ". . . .

> "The duties of a service officer, peace officer and corrections officer in this case are to maintain custody of prisoners and to help operate a local detention facility. An executive officer is not lawfully performing his or her duties if he is using unreasonable or excessive force in his duties."[4]

_____

[3] The People note that the second prong of section 69 was mentioned when the trial court read the charges at the beginning of trial, and that the prosecutor used the term "resist" several times during argument. But, as we have described *ante*, the trial court narrowed the section 69 charges to include only the first prong, charging threats (the "first way," as our Supreme Court has characterized it) and the trial court told the jury to follow the law as it instructed. We presume the jury followed the trial court's concluding instructions. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Zack* (1986) 184 Cal.App.3d 409, 416.)

[4] Another instruction explained excessive force was *not* the lawful performance of an officer's duties, and the People had to prove beyond a reasonable doubt that Zufall and Amaya were lawfully performing their duties. The jury was also instructed on self-

10

Defendant argues that instructing the jury: "The executive officer does not need to be performing his or her job duties at the time the threat is communicated," implies the officer *could* be engaged in his duties at the time of the threat, which in turn signals the applicability of the "second way" of violating section 69 and thus the availability of section 148 as a necessarily included offense. (Presumably this is because defendant would then no longer be merely preventing duties that have yet to be performed, but would be resisting ongoing performance of these same duties.)

The sentence on which defendant relies on is part of the paragraph defining who is (and who is not) an executive officer for purposes of the applicability of the section 69 charge. Here, the deputies' status as executive officers was called into question by the defense position at trial--that because they were using excessive force at the time the defendant made the alleged threats, they were not acting as executive officers within the meaning of section 69. This description does not bring the "second way" of violating section 69 back into play; it does not re-introduce the concept of knowing resistance by force or violence, which is a necessary component of the "second way."

Accordingly, because the prosecutorial election (to which no objection was interposed) effectively amended the charges to eliminate the second prong of section 69, and the jury was not instructed on the "second way" of violating section 69, the trial court properly refrained from instructing on section 148.

Finally, defendant concedes any error is subject to the *Watson* standard of prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836). We agree. (See *Breverman*, *supra*, 19 Cal.4th at pp. 176-178.) That test "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other

---

defense, and the People's burden to prove beyond a reasonable doubt that defendant was not acting in self-defense.

11

things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, *supra*, 19 Cal.4th at p. 177.)  A "probability" in this context does not mean more likely than not, but a reasonable chance, more than a mere abstract possibility.  (See *People v. Wilkins* (2013) 56 Cal.4th 333, 351.)

The jury in this case was presented with two starkly different accounts.  In one, defendant threatened violence if he was removed from the cell, prepared himself for conflict by stripping and then wetting himself and the cell down, and then fought the officers attempting to remove him from his cell.  In the other, the officers mounted a punitive attack on defendant to teach him respect for the court system.  The jury was instructed that the People had the burden to prove beyond a reasonable doubt that the officers were acting lawfully, and to disprove beyond a reasonable doubt the defense claim of self-defense.  In such circumstances, it is not reasonably probable that the jury would have convicted defendant of the lesser offense of willful, but non-forcible, resistance to the officers, had instruction thereon been given.

II

*Section 654*

The trial court imposed consecutive sentences for threatening and assaulting Zufall (counts 1 & 3), finding they were separate instances of violence or threats.  Defendant contends the sentence for assault (§ 241.1, count 3) should have been stayed (§ 654) because both acts furthered defendant's "singular objective of avoiding going to court[.]"  We do not agree with this view.

"A defendant cannot be punished multiple times for convictions that arise out of 'an indivisible transaction' and have a 'single intent and objective.'  [Citation.]  'A trial court's implied finding that a defendant harbored a separate intent and objective for each

12

offense will be upheld on appeal if it is supported by substantial evidence.'" (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1336-1337.)

As defendant acknowledges, the prosecutor argued defendant's use of threats satisfied the section 69 charge, and *then* defendant tried to punch Zufall after the Taser failed to subdue him. That was consistent with the trial evidence, which supports the trial court's finding that defendant committed one threat of violence and *then* committed one act of violence. Defendant had time to reflect between the two acts, but chose to fight after he deflected the Taser. "[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm." (*People v. Felix* (2001) 92 Cal.App.4th 905, 915, see *id*. at pp. 915-916 [upholding multiple punishment; "Felix had time to reflect before making the second threat. The trial court could reasonably infer that because of his anger he intended the second threat to cause new emotional harm"]; cf. *People v. Martin* (2004) 133 Cal.App.4th 776, 781 [on the particular facts of the case, Martin's "sole objective in both resisting arrest and committing battery on a police officer was to free himself. The battery upon the officer does not appear to have been intentional, but merely the result of appellant's physical gyrations aimed at freeing himself"].)[5]

Therefore, the punch at Zufall, being an act apart from and temporally separated from the threat to deter Zufall from performing his duties, was separately punishable.

_____

[5] For the first time in the reply brief, defendant cites *People v. Young* (1983) 146 Cal.App.3d 729 (*Young*), which dealt with whether using facts from stayed counts, or counts that should have been stayed, may be used as aggravating factors. Defendant's brief misquotes *Young*; in pertinent part, *Young* states: "The fact that the sections 69, 148 and 245, subdivision (b) violations in reference to Officer Mairel arose out of indivisible conduct toward the principal objective of avoiding arrest should not mean that the factor of avoiding arrest at all costs may not be used to aggravate the assault with a deadly weapon upon a peace officer charge (§ 245, subd. (b))." (*Young*, *supra*, 146 Cal.App.3d at p. 735.) Young does not hold the general objective of "avoiding arrest" allows a person to commit multiple acts of violence or threats without fear of increased punishment. It depends on the facts.

# III

## *Self Defense*

Defendant contends the trial court instructed incorrectly on self-defense as to counts 1 and 5, because the instructions did not reference his right to use *threats* in order to defend himself from an unlawful attack by the peace officers.

During the instructional conference, the trial court agreed with defense counsel's view that "There could be threats made that were in self-defense."

The trial court instructed (CALCRIM No. 3470) in part as follows:

> "Self-defense is a defense to Count 1, 3 and 5 and the lesser charges to Count 3, which is simple battery. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if; one, the defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully. Two, the defendant reasonably believed that the immediate use of force was necessary to defend against the danger. And three, the defendant used no more force than was reasonably necessary to defend against that danger.

> ". . . . .
> "The defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself. The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of Counts 1, 3 and 5 and the lesser crime to Count 3 of simple assault."

The trial court also instructed (CALCRIM No. 2671) that the People had the burden to prove beyond a reasonable doubt the officers were lawfully performing their duties, and that an inmate "may lawfully use reasonable force to defend himself. [¶] A person used reasonable force when he; one, uses that degree of force that he actually believes is reasonably necessary to protect himself from the officer's use of unreasonable or excessive force; and two, use[s] no more force than a reasonable person in the same situation would believe is necessary for his protection."

We see nothing in any of these instructions that *precluded* defendant from arguing that he was entitled to make threats of violence to defend himself. Even though "force"

14

was not explicitly defined to include "threats of force," neither was it defined to *exclude* such meaning. The trial court instructed the jury that the People had to prove beyond a reasonable doubt both that the officers were acting lawfully and that defendant was *not* acting in self-defense when he made his threats. The defense did not even argue that he defended himself by threats. The instruction was not deficient.

IV

*Presentence Credits*

The trial court awarded defendant 732 days of actual presence custody credit, and 366 days for conduct credit, for a total of 1,098 days of presentence credit. Defendant contends he is entitled to the application of a more favorable conduct credit formula. For the reasons explained, we disagree.

A. *Statutory Interpretation*

Defendant first contends he is entitled to the benefit of the new formula based on statutory construction, albeit noting contrary authority.

Under the venerable *Bobb-Smith* "two-for-four" formula described by this court, section 4019 previously provided that for every four-day period a defendant served, she or he would be deemed to have served a six-day period, and therefore would be entitled to two days of conduct credit. (See *People v. Bobb* (1989) 207 Cal.App.3d 88, 97-98; *People v. Smith* (1989) 211 Cal.App.3d 523, 527; Stats. 1982, ch. 1234, § 7, p. 4554.)

Later, after intervening changes in the law not here relevant, the 2011 Realignment Act authorized conduct credit for local prisoners at the rate of two days for every two days spent in local custody. (Stats. 2011, ch. 15, § 482.) The new formula became effective October 1, 2011. (Stats. 2011, 1st Ex. Sess. 2011–2012, ch. 12, § 35; § 4019, subd. (f).) The new formula applies to persons who have strikes. (See *People v. Garcia* (2012) 209 Cal.App.4th 530, 539-540 (*Garcia*).) Therefore, *if* this formula applied, defendant would receive a larger amount of credit than under the traditional *Bobb-Smith* formula.

15

Section 4019, subdivision (h) provides: "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." Defendant contends that while the first sentence expresses the Legislature's intent that application of the enhanced conduct credits are limited to defendants whose crimes are committed on or after October 1, 2011, the second sentence implies that any days earned by a defendant on or after October 1, 2011, should be calculated under the current law. We disagree.

In *People v. Ellis* (2012) 207 Cal.App.4th 1546 (*Ellis*), the court concluded: "In our view, the Legislature's clear intent was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011. [Citation.] The second sentence does not extend the enhancement rate to any other group, but merely specifies the rate at which all others are to earn conduct credits. So read, the sentence is not meaningless, especially in light of the fact the October 1, 2011, amendment to section 4019, although part of the so-called realignment legislation, applies based on the date a defendant's crime is committed, whereas section 1170, subdivision (h), which sets out the basic sentencing scheme under realignment, applies based on the date a defendant is sentenced." (*Ellis*, *supra*, 207 Cal.App.4th at p. 1553.)

*People v. Rajanayagam* (2012) 211 Cal.App.4th 42 (*Rajanayagam*), held "we cannot read the second sentence to imply any days earned by a defendant *after* October 1, 2011, shall be calculated at the enhanced conduct credit rate for an offense committed before October 1, 2011, because that would render the first sentence superfluous." (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 51.) "Instead, subdivision (h)'s second sentence attempts to clarify that those defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. [Citation.] However inartful the language of subdivision (h), we read the second sentence as reaffirming that defendants

16

who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law. [Citation.] To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence." (*Id*. at p. 52.)

We agree with *Ellis* and *Rajanayagam*. (See also *People v. Hul* (2013) 213 Cal.App.4th 182, 186-187; *Garcia, supra,* 209 Cal.App.4th at p. 541 [following *Ellis*].) Because we can interpret the statutory intent by reading the statute as a whole, giving effect to all its parts, the rule of lenity, applicable where two plausible candidates of meaning stand in relative equipoise, does not compel interpreting the statute in defendant's favor. (See *People v. Cornett* (2012) 53 Cal.4th 1261, 1271.)

B. *Equal Protection*

Defendant also contends he is entitled to the benefit of the new formula under principles of equal protection. We disagree.

"The essence of an equal protection claim is that two groups, similarly situated with respect to the law in question, are treated differently." (*Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 892. )

In *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), our Supreme Court held that a prior amendment to section 4019 must be read prospectively only, even though the Legislature did not expressly so state, and even though this meant "prisoners whose custody overlapped the statute's operative date . . . earned credit at two different rates." (*Brown*, *supra*, 54 Cal.4th at p. 322.) *Brown* reasoned that "the important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response. That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Id.* at pp. 328–330; see *Lara*, *supra*, 54 Cal.4th at p. 906, fn. 9 [noting that the "day-for-day"

17

credit formula created by the Realignment Act "does not benefit defendant because it expressly applies only to prisoners who are confined to a local custodial facility '*for a crime committed on or after October 1, 2011*. (§ 4019, subd. (h), italics added).'"].)

Following *Brown*'s lead, two appellate courts have concluded that persons who commit crimes before and after the October 1, 2011 effective date of the new credit formula are *not* similarly situated, and therefore those on the "wrong" side of the dateline have not suffered an equal protection violation. (See *Ellis*, *supra*, 207 Cal.App.4th at pp. 1550-1552; *People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397 (*Kennedy*).)

And although two other appellate courts have found the two groups to be similarly situated, those courts have held that treating those two groups differently is subject to rational-basis scrutiny--not "strict" scrutiny as defendant seeks to apply herein--and that the disparate treatment caused by legislative line-drawing regarding accrual of presentence credits survives such scrutiny. (See *People v. Verba* (2012) 210 Cal.App.4th 991, 995-997 (*Verba*); *Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 53-56; see also *Kennedy*, *supra*, 209 Cal.App.4th at pp. 397-399 [groups *not* similarly situated, but also finding a rational basis for disparate treatment].)

Like the *Verba* court: "We see nothing irrational or implausible in a legislative conclusion that individuals should be punished in accordance with the sanctions and given the rewards in effect at the time they committed their offense." (*Verba*, *supra*, 210 Cal.App.4th at p. 997.) Accordingly, even if we found the two groups similarly situated, we would find a rational basis for the disparate treatment, and therefore defendant has not established an equal protection violation in this case.

V

*Peace Officer Personnel Files*

We agree with the parties that this court must review the in camera proceedings to determine whether the trial court abused its discretion in finding no disclosable materials were contained in the peace officer personnel files. (See *People v. Samuels* (2005) 36

Cal.4th 96, 110; *People v. Wycoff* (2008) 164 Cal.App.4th 410, 414.)  Having reviewed the transcript of the in camera hearing, we find no abuse of discretion.  (See *People v. Myles* (2012) 53 Cal.4th 1181, 1209.)

## DISPOSITION

The judgment is affirmed.

DUARTE             , J.

We concur:

MURRAY             , Acting P. J.

HOCH             , J.